IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**TIMOTHY B.,**
*Appellant,*

*v.*

**DEPARTMENT OF CHILD SAFETY, H.B.,**
*Appellees.*

---

No. CV-20-0318-PR
**Filed March 7, 2022**

---

Appeal from the Superior Court in Maricopa County
The Honorable Michael D. Gordon, Judge
No. JD33713
**REVERSED AND REMANDED**

---

Opinion of the Court of Appeals, Division One
250 Ariz. 139 (App. 2020)
**VACATED**

---

COUNSEL:

David W. Bell, Law Office of David W. Bell, Mesa; Steven Czop (argued), Czop Law Firm, PLLC, Higley, Attorneys for Timothy B.

Mark Brnovich, Arizona Attorney General, Drew C. Ensign, Section Chief, Civil Appeals, Dawn R. Williams (argued), Autumn Spritzer, Assistant Attorneys General, Tucson, Attorneys for Department of Child Safety

---

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which JUSTICES LOPEZ, BEENE, and KING joined. JUSTICE BOLICK concurred in the result.[*]

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1    The juvenile court can terminate the parent-child relationship if at least one ground listed in A.R.S. § 8-533(B) exists, and termination is in the child's best interests. *See Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50 ¶ 8 (2018). The length-of-sentence ground for termination is proven if an incarcerated parent's sentence is so lengthy that "the child will be deprived of a normal home for a period of years." § 8-533(B)(4). What is a "normal home"? That is the primary question before us.

## BACKGROUND

¶2    H.B. was born in September 2012 and initially lived with her father, Timothy B., her mother, Jaliece J., and her half-siblings. When H.B. was two-and-one-half years old, Timothy was convicted of several felony charges, including kidnapping, attempted sexual assault, unlawful flight from law enforcement, and aggravated assault. The superior court sentenced him to 12.5 years in prison and imposed lifetime probation upon his release, which will occur in 2024 when H.B. is eleven years old.

¶3    After Timothy was incarcerated, H.B. lived with her paternal grandmother and paternal aunt for the next few years. During that time, they facilitated extensive contact between Timothy and H.B. Timothy frequently spoke with his daughter by telephone, wrote to her often, and had regular in-person visits with her. Neither the grandmother nor the aunt established a legal responsibility to care for H.B. through a guardianship. *See* A.R.S. § 8-871(A) (authorizing permanent guardianships).

---

[*]    Chief Justice Brutinel and Justice Montgomery are recused from this matter.

**¶4**        H.B. also spent time with Jaliece, who lived with H.B.'s half-siblings and another man.   The Arizona Department of Child Safety ("DCS") became involved in January 2017 when Jaliece was arrested while H.B. was visiting.   After an investigation revealed child neglect and other issues, DCS removed the children, including H.B., from Jaliece's custody.

**¶5**        The juvenile court found H.B. and her half-siblings dependent as to Jaliece and their respective fathers.   H.B.'s paternal aunt asked that H.B. be placed with her, but that request was denied because the aunt lived with the paternal grandmother, who did not pass a background check. Instead, the court granted DCS's request that H.B. be placed with Jaliece's friend, who had known H.B. since birth.   During H.B.'s lengthy dependency, she spoke with Timothy weekly and visited him monthly.

**¶6**        DCS was unable to successfully reunify Jaliece with her children after two years of providing services, and the court approved a change in case plan to severance and adoption.   DCS sought to terminate Timothy's parental rights pursuant to the length-of-sentence ground listed in § 8-533(B)(4).   After a multiple-day evidentiary hearing held over a few months in 2019, the court found that DCS had proved this ground and that termination was in H.B.'s best interests. [1]   It therefore terminated Timothy's parental rights to H.B.

**¶7**        In considering the length-of-sentence ground, the court relied on *In re Appeal in Maricopa County Juvenile Action No. JS-5609*, 149 Ariz. 573, 575 (App. 1986), which found that "[t]he 'normal home' referred to in the statute relates to [an incarcerated parent's] obligation to provide a normal home, a home in which the [incarcerated parent] has a presence, and it does not refer to a 'normal home' environment created by [others]."   The court also considered non-exclusive factors set forth in *Michael J. v. Arizona Department of Economic Security*, 196 Ariz. 246, 251–52 ¶ 29 (2000):

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the

---

[1]        In the same ruling, the court terminated Jaliece's rights to H.B. Jaliece did not appeal, and therefore the propriety of the court's termination of her rights is not before us.

relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

In applying these factors, the court found that on the one hand, Timothy and H.B. enjoy a "fairly strong relationship" and that "[Timothy] has done all he can to maintain and nurture his relationship with [H.B.]." The court remarked on their "strong bond"; "frequent telephone contact"; regular visits, which included helping H.B. with homework; and exchanges of cards, gifts, letters, poetry, and drawings. According to the court, Timothy clearly loves his daughter, is "kind and attentive," and both H.B. and Timothy enjoy visitation.

¶8        On the other hand, the court found that Timothy's love and care is insufficient to meet H.B.'s needs. The court observed that "[H.B.] has no parent available to walk her to school, to teach her how to ride a bicycle, go to school functions, and help with homework on a regular basis" and that Timothy "has been and remains unavailable for [H.B.'s] daily care and for milestone events." It also found that the nature of Timothy's convictions made it unlikely he would be able to parent immediately following release from custody, and that he could be reincarcerated if he violates probation.

¶9        The court concluded that while Timothy's efforts have been "extraordinary and laudable," his incarceration has and will continue to deprive H.B. "of her father's everyday guidance, care and support" for over half her childhood, meaning she is deprived of a normal home for a period of years, thereby demonstrating the length-of-sentence ground for termination under § 8-533(B)(4).

¶10        Turning to H.B.'s best interests, the court focused "solely" on her interests under "the totality of the circumstances." It found that H.B. is happy in an adoptive placement with a younger half-sister, and the placement meets all her needs; the placement will ensure that H.B. regularly visits her other half-siblings; and absent termination, H.B. would "languish further awaiting for [her] father to be released from custody with a hope that [he] may be ready to safely parent [her]."

**¶11**         The court of appeals vacated the juvenile court's termination order as it relates to Timothy and remanded for reconsideration, citing two errors.  *See Timothy B. v. Dep't of Child Safety*, 250 Ariz. 139, 141 ¶ 1 (App. 2020).   First, it concluded the juvenile court mistakenly relied on the definition of "normal home" announced in *JS-5609*, characterizing that definition as overly rigid by failing to recognize "that a 'normal home' may include a parent with a non-traditional presence."  *See Timothy B.*, 250 Ariz. at 144 ¶ 18.   Second, it found that the juvenile court had erred by using a best-interests inquiry focusing "*solely* on the children's best interest" rather than "balanc[ing] the interests of *both* the child and the parent."   *Id.* at 145–46 ¶ 21.

**¶12**         We granted DCS's petition for review to provide guidance on what constitutes a "normal home" under § 8-533(B)(4) and to clarify the best-interests inquiry, both recurring issues of statewide importance.


## DISCUSSION

### I.

**¶13**         The juvenile court conducts a two-step inquiry in determining whether to terminate the parent-child relationship.   *See Alma S.*, 245 Ariz. at 149–50 ¶ 8.   First, the court must decide whether clear and convincing evidence demonstrates at least one ground listed in § 8-533(B).   *Id.* at 149 ¶ 8.   The grounds listed establish parental unfitness by showing a parent's inability to properly parent, a voluntary relinquishment of parental rights, or actions that forfeit a parent's right to contest severance.   *Id.* at 150 ¶¶ 9– 10.   Second, assuming a § 8-533(B) ground exists, the court must decide whether a preponderance of evidence supports a finding that termination is in the child's best interests.   *Id.* at 149–50 ¶ 8.

**¶14**         We will affirm a termination order unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence.  *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 10 (2021). A court abuses its discretion by misapplying the law.  *State v. Miles*, 243 Ariz. 511, 513 ¶ 7 (2018).

### A.

**¶15**         The length-of-sentence ground for termination provides, in relevant part, that termination is justified when "the parent is deprived of

civil liberties due to the conviction of a felony . . . [and] the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." § 8-533(B)(4). DCS argues the court of appeals misinterpreted "normal home" as possibly including a home where the incarcerated parent has a non-traditional presence. It asserts the court conflated the *Michael J.* factors and "improperly magnifie[d] the importance of the child's need to maintain a relationship with his or her incarcerated parent while ignoring the importance of the child's other needs" that an in-home parent typically addresses.

¶16 We review the meaning of § 8-533(B) de novo. *See Rasor v. Nw. Hosp., LLC*, 243 Ariz. 160, 163 ¶ 11 (2017). Our primary goal is effectuating the legislature's intent. *Id.* at 164 ¶ 20. If the statutory language has only one reasonable interpretation when read in context, we apply that interpretation without further analysis. *Id.* Where more than one reasonable interpretation exists, we employ secondary interpretive principles, such as examining legislative history, any statutes relating to the same subject or general purpose, the effects and consequences of differing interpretations, and the spirit and purpose of the statute. *See id.*; *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017).

¶17 "Normal home" as used in § 8-533(B)(4) has more than one reasonable interpretation. The legislature did not define the term, and what constitutes a "normal home"—whether referring to a physical structure or the environment created by its inhabitants—is not plainly evident in our diverse society. *See Normal*, Merriam-Webster, https://www.merriam-webster.com/dictionary/normal (last visited Feb. 3, 2022) (defining "normal" in part as "conforming to a type, standard, or regular pattern" or "characterized by that which is considered usual, typical, or routine"); *Home*, Merriam-Webster, https://www.merriam-webster.com/dictionary/home (last visited Feb. 3, 2022) (defining "home" in part as "the house or apartment where a person lives" or "a family living together"). Indeed, underscoring this lack of plain meaning, neither the parties nor the court of appeals identifies the meaning of "normal home." And although the court of appeals in *JS-5609* defined "normal home," it did so without any analysis. *See JS-5609*, 149 Ariz. at 575.

¶18 Applying secondary interpretive principles reveals the legislature's intended meaning of "normal home." We start by examining § 8-533's legislative history and the legislature's stated purpose in enacting the statutes governing termination of the parent-child relationship. *See*

*Rasor*, 243 Ariz. at 164 ¶ 20; *Special Fund Div. v. Indus. Comm'n of Ariz.*, 191 Ariz. 149, 153 ¶ 10 (1998) (considering legislative purpose to interpret statute).

**¶19** Before 1970, Arizona did not have a separate statutory scheme for terminating the parent-child relationship. Instead, termination occurred in the context of adoption, with or without the "natural" parent's consent. [2] *See, e.g.*, A.R.S. Part IV § 17-1193 (1913) (excepting the requirement that the natural parent must consent before the court may enter an adoption order if "the court determines that the interest of the child will be promoted thereby"); A.R.S. § 8-104 (1956) (same), -108(A) (1956) (providing that "the child shall no longer be the child or heir of the natural parents" upon entry of the adoption order). Outside the adoption context, the state department of health licensed public and private child welfare agencies to care for neglected children or place them in a "family home" or an institution, *see* A.R.S. §§ 8-501, -506 (1956), and also certified foster homes to care for such children, *see* A.R.S. §§ 8-513 to -515 (1956). Parental rights were not terminated when children were placed in family homes, institutions, or foster homes. *See* §§ 8-501 to -518 (1956).

**¶20** In 1970, the legislature ended the practice of maintaining the parent-child relationship during long-term institutional or foster care by prescribing termination procedures. *See* 1970 Ariz. Sess. Laws ch. 153, § 1 (2nd Reg. Sess.). These procedures were designed to "safeguard the rights and interests of all parties concerned and promote their welfare and that of the state." *Id.* The act reflected a "philosophy that, wherever possible, family life should be strengthened and preserved" and acknowledged that the termination issue was so vitally important that "a judicial determination [should be made] in place of attempts at severance by contractual arrangements, express or implied, for the surrender or relinquishment of children." *Id.*

**¶21** The 1970 act authorized termination of a parent-child relationship if any one of several grounds existed. *See* A.R.S. § 8-533 (1970). This original version of § 8-533 included a length-of-sentence ground as a basis for termination that is substantively identical to present-

---

[2] The legislature required consent from the parent or a statutory equivalent from 1933 to 1952. *See Westerlund v. Croaff*, 68 Ariz. 36, 41 (1948); 1952 Ariz. Sess. Laws ch. 96, § 3 (2nd Reg. Sess.).

day § 8-533(B)(4). *See* § 8-533(4) (1970) (authorizing termination when "the parent is deprived of his civil liberties due to the conviction of a felony . . . if the sentence of such parent is of such length that the child will be deprived of a normal home for a period of years"). Contrary to today's requirement, termination could be ordered without separately considering the child's best interests. *See* A.R.S. § 8-538(B) (1970).

¶22 In 1986, the legislature reenacted § 8-533 and other statutes related to foster care. *See* 1986 Ariz. Sess. Laws ch. 205, § 1 (2nd Reg. Sess.). The act's stated purpose was "to expedite the adoption of numerous children who remain in temporary foster care for indeterminate lengths of time with no hope of being returned to their natural parents and, in so doing, promote a stable and long-term family environment for these children." *Id.* The 1986 act authorized termination if any one ground listed in § 8-533(B) was present, including the length-of-sentence ground existing today. *See* A.R.S. § 8-533(B)(4) (1986). The court was permitted to "also consider the needs of the child" in deciding whether to terminate parental rights. *See* § 8-533(B) (1986).

¶23 The legislature has amended § 8-533 many times since 1986, including adding the best-interests inquiry, but has kept the length-of-sentence ground substantively intact since 1970. We deduce from § 8-533's history and stated purpose that the legislature intended a "normal home" to be "a stable and long-term family environment" outside institutional or foster home care, which had predominantly served as living conditions for neglected children before 1970. Indeed, the legislature's intent to avoid having children linger in foster care echoes throughout other grounds justifying termination in § 8-533(B). *See* § 8-533(B)(3) (mental illness and drug or alcohol issues that render the parent "unable to discharge parental responsibilities" for a prolonged period of time), -533(B)(8) (out-of-home placement for nine or fifteen months or six months for a child under three), -533(B)(11) (in and out of out-of-home placement within eighteen months).

¶24 The "normal home" does not necessarily require the incarcerated parent's physical presence, as the *JS-5609* court concluded. First, the legislature's intent to strengthen and preserve familial bonds, whenever possible, cuts against requiring the incarcerated parent's physical presence in the home if the child is otherwise in a stable and long-term family environment outside foster care. *See* 1970 Ariz. Sess. Laws ch. 153, § 1 (2nd Reg. Sess.); *see also* A.R.S. § 1-601 (recognizing a parent's

8

fundamental liberty interest in raising a child and directing that the state's justified infringement on that right be "narrowly tailored and . . . not otherwise served by a less restrictive means"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (recognizing that parents have a fundamental liberty interest in "the care, custody, and management of their child" that "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State").

**¶25**          Second, the option for establishing a permanent guardianship for dependent children without terminating parental rights evidences the legislature's intent that the incarcerated parent does not have to be physically present for the child to live in a "normal home."   *See* A.R.S. § 8-862(B)(1) (permitting the court to establish a plan for permanent guardianship at the permanency hearing rather than a plan for termination of parental rights).   The court can establish a permanent guardianship under specified conditions, including when "termination of parental rights would not be in the child's best interests."   § 8-871(A)(4).   A permanent guardianship divests the birth or adoptive parent of legal custody of the child and ends the child's dependency, thereby removing the child from foster care, but "does not terminate the parent's rights."   A.R.S. § 8-872(H), (J).   The court can tailor the guardianship to the child's unique best interests by ordering visitation with the birth or adoptive parent, siblings, and other relatives, and by entering other directives as fitting.   *See* §§ 8-871(D), -872(I).   Because we can assume as a matter of common sense that the legislature would not intend to place a child in an "abnormal home," it follows that a "normal home" can consist of a home in which the child has a permanent guardian, and the birth or adoptive parent is not physically present in the home but has some relationship with the child that serves the child's best interests.

**¶26**          Third, we are mindful that if the birth or adoptive parent's physical presence is required to make a "normal home," a prison sentence of any "period of years" would necessarily result in termination of parental rights.   § 8-533(B)(4).   If that was the legislature's intent, it could have simply provided as a ground for termination that the parent is imprisoned for a period of years.   The directive to also consider whether the child would be "deprived of a normal home" would have been unnecessary because the deprivation would inherently arise from a multiple-year prison term.   *See id.*; *see also Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019) ("A cardinal principle of statutory interpretation is to give meaning, if possible,

to every word and provision so that no word or provision is rendered superfluous.").

¶27    For these reasons, we define "normal home" in § 8-533(B) as a stable and long-term family environment outside a foster care placement, where another parent or a permanent guardian resides and parents the child, and where the incarcerated parent affirmatively acts to maintain a relationship with the child that contributes to rather than detracts from the child's stable, family environment.   When another parent is unavailable to provide a normal home for the child for a period of years during which the other parent is incarcerated, the juvenile court should consider whether another person is willing to be the child's permanent guardian and if the grounds for a permanent guardianship exist, including that a guardianship would be in the child's best interests.   *See* § 8-871(A).   If so, the court should additionally consider whether the incarcerated parent could contribute to rather than detract from the stable, family environment provided by the permanent guardian during incarceration.   In making these decisions, the court should consider the non-exclusive *Michael J.* factors.   We modify the fifth factor by adding that the court should consider the availability of a permanent guardian to provide a normal home life if another parent is unavailable.   *See Michael J.*, 196 Ariz. at 251–52 ¶ 29. Considering our definition of "normal home," we disapprove the different definition put forth in *JS-5609*.[3]

¶28    Turning to this case, we conclude that remand is necessary. The juvenile court applied the definition of "normal home" from *JS-5609* and grounded its ruling on Timothy's inability to be physically present in H.B.'s home.   Thus, it did not consider whether a permanent guardianship could provide H.B. with a "normal home" while Timothy maintained his parental rights.   Notably, in denying Timothy's motion to change physical

---

[3]    In *Jessie D.*, this Court cited *JS-5609*'s definition of "normal home" in describing the length-of-sentence factor.   *See Jessie D.*, 251 Ariz. at 579 ¶ 9. But what constitutes a "normal home" was not at issue in *Jessie D.*, and the definition did not affect our analysis.   To the contrary, and arguably forecasting our decision here, we concluded that the juvenile court there misapplied the second *Michael J.* factor—whether the parental relationship could be continued and nurtured during incarceration—by finding that an incarcerated father "was unable to interact with the children in more traditional settings (i.e., home, school, and recreational)."   *Id.* at 581 ¶ 16.

custody of H.B. to her paternal aunt, who had previously facilitated visitation between father and daughter, the court acknowledged that H.B. "has a bond with her [p]aternal [a]unt," who is willing to serve as a legal permanent guardian; the aunt's home study "raised no concerns" and the aunt "can fundamentally meet all [H.B.'s] needs"; and a guardianship would "leave[] the door open for [Timothy] to demonstrate changed circumstances." On remand, the court should consider the permanent guardianship option when considering the *Michael J.* factors and any other relevant factors to determine whether H.B. would be deprived of a "normal home" for a period of years by Timothy's incarceration.

**B.**

**¶29**        The court of appeals, relying on *Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 35 (2005), concluded the juvenile court erred in conducting the best-interests inquiry by focusing "solely" on H.B.'s best interests after finding the length-of-sentence ground rather than "balanc[ing] the interests of *both* the child and the parent." *Timothy B.*, 250 Ariz. at 146 ¶ 21. DCS argues the court of appeals misinterpreted *Kent K.* and improperly subordinated H.B.'s interests to Timothy's interests by remanding to the juvenile court to conduct "a proper balancing of H.B.'s and Timothy's respective interests." *See id.* ¶ 22.

**¶30**        In *Kent K.*, this Court recognized that once the juvenile court finds the parent unfit due to the existence of at least one ground listed in § 8-533(B), the parent's continuing interests in the care and custody of the child become less important than the child's best interests. *See Kent K.*, 210 Ariz. at 286 ¶ 35. Consequently, at this stage, "the court must balance this diluted parental interest against the independent and often adverse interests of the child in a safe and stable home life." *Id.*; *see also Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 15 (2016). The dispute here focuses on what is required in "balancing" these interests.

**¶31**        The "balancing" performed by the juvenile court during the best-interests inquiry does not pit the parent's interests against the child's best interests to determine which predominate; at this stage, it is a given that the child's best interests predominate. *See Kent K.*, 210 Ariz. at 286 ¶ 35. As this Court has stated several times, the juvenile court's primary concern in the best-interests inquiry is the "child's interest in stability and security." *Alma S.*, 245 Ariz. at 150 ¶ 12 (quoting *Demetrius L.*, 239 Ariz. at 4 ¶ 15); *see Kent K.*, 210 Ariz. at 287 ¶ 37; *see also Kent K.*, 210 Ariz. at 286 ¶ 35

11

("In a best interests inquiry, however, we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence."). In deciding what is best for the child, "balancing" requires examining the totality of the circumstances existing at the time of termination, including the parent's interest in maintaining a positive parent-child relationship and the parent's efforts and ability to do so. *See Alma S.*, 245 Ariz. at 150–51 ¶ 13. Thus, "courts should consider a parent's rehabilitation efforts as part of the best-interests analysis." *See id.* at 151 ¶ 15. For example, here, in examining the totality of the circumstances, the juvenile court should consider Timothy's past and ongoing efforts to parent H.B. from prison and the impact of those efforts on H.B.'s interests in a safe and stable home life in deciding whether H.B.'s best interests are served by termination or maintenance of the parent-child relationship. *See id.* at 150–51 ¶ 13; *see also Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98–99 ¶ 12 (App. 2016) (noting that bonding between a child and biological parent is a factor but not dispositive in a best-interests analysis).

¶**32**       To the extent the court of appeals' opinion suggests that a court must give equal weight to a parent's interest in the custody and care of a child and the child's interests in security and stability and then balance those interests in making the best-interests determination, we disagree. The juvenile court must not "subordinate the interests of the child to those of the parent once a determination of unfitness has been made." *Alma S.*, 245 Ariz. at 151 ¶ 15. The parent's exercise of parental rights must be viewed through a lens focused on the child's best interests.

¶**33**       The juvenile court here focused "solely" on H.B.'s best interests as distinct from Timothy's interests in making the best-interests determination. It is not clear from the ruling whether the court considered Timothy's efforts to parent H.B. from prison and the strength of the bond between Timothy and H.B. in determining whether termination would serve H.B.'s best interests. We need not decide whether error occurred. If on remand the court finds the existence of the length-of-sentence ground for termination and conducts a best-interests analysis, it should consider Timothy's past and ongoing efforts to parent H.B. from prison and their impact on H.B.'s interest in a safe and stable home life.

¶**34**       Finally, we recognize that conducting the best-interests inquiry after finding the length-of-sentence ground for termination may be repetitive. Here, when the court considers the availability of a permanent

guardianship in deciding whether Timothy's imprisonment will deprive H.B. of a normal home for a period of years, it may consider as a relevant factor under the guardianship statute whether termination of Timothy's parental rights would be in H.B.'s best interests. *See* § 8-871(A)(4). Nevertheless, even if the court concludes that a permanent guardianship is not appropriate and finds the existence of the length-of-sentence ground for termination, it must conduct a renewed best-interests inquiry in making the termination decision. *See* § 8-533(B).

## CONCLUSION

¶**35** We reverse the juvenile court's judgment and remand for a new determination considering this opinion. We vacate the court of appeals' opinion.

BOLICK, J., concurring in the result:

**¶36** I enthusiastically join the result here. Along with the recent decision in *Jessie D. v. Department of Child Safety*, 251 Ariz. 574 (2021), the Court has taken significant steps to reconcile our jurisprudence with the fundamental rights of parents under the United States Constitution and Arizona law. However, I write separately because the framework within which we decide these cases still falls significantly short of constitutional requirements.

**¶37** It is uncontestable, as the Court acknowledges, *supra* ¶ 24, that parents have a fundamental right to the control and upbringing of their children. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925). Ordinarily, when the government seeks to divest a fundamental right, it must demonstrate a compelling purpose and that its means of accomplishing that purpose are narrowly tailored. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

**¶38** Even more specifically, Arizona law recognizes that "[t]he liberty of parents to direct the upbringing . . . of their children is a fundamental right." A.R.S. § 1-601(A). The government "shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." § 1-601(B).

**¶39** In this case, the father, Timothy B., gravely jeopardized his rights to and relationship with his daughter by committing very serious crimes. Indeed, A.R.S. § 8-533(B)(4) provides as a basis for termination of parental rights that "the child will be deprived of a normal home for a period of years."

**¶40** In *Jessie D.*, we recognized how difficult it is for a person sentenced to incarceration for a period of years to maintain a parental relationship and that the state must take steps to facilitate it. 251 Ariz. at 581 ¶ 17. In this case, Timothy's determination, combined with the efforts of both prison officials and his daughter H.B.'s caretakers, has culminated in a deep, loving relationship between father and daughter. Indeed, Timothy testified that prison officials enlisted him to provide classes to other inmates hoping to nurture a parental relationship with their children. Although H.B. clearly desires to maintain her relationship with her dad,

DCS determined that permanently terminating that relationship in favor of adoption was in her best interests.

¶41 The opinion today takes two important steps to achieve a just result in this case. First, consistent with statutory intent, it construes "normal home" in § 8-533(B)(4) to encompass a stable home in which the parent does not have an ongoing physical presence. *Supra* ¶¶ 24–27. To hold otherwise, as the Court recognized in a similar context in *Jessie D.*, "implies that incarcerated parents could never adequately maintain a parent-child relationship with their young children." 251 Ariz. at 581 ¶ 17.

¶42 Second, the Court requires the trial court to consider whether a permanent guardianship is possible here as an alternative to termination. A guardianship appointment would protect Timothy's rights, preserve the father-daughter relationship, and achieve the stable home environment that DCS seeks. As such, it is a classic example of a "less restrictive means" that Arizona law commands us to consider. § 1-601(B).

¶43 However, the overall framework the Court applies continues to diverge from constitutional requirements. As the Court observes, in termination cases, it applies a "two-step inquiry." *Supra* ¶ 13. First, it requires proof by clear and convincing evidence that one of the statutory grounds for termination exists under § 8-533(B). *Id.* Second, it requires evidence under the less-demanding preponderance of the evidence standard that the termination is in the child's best interests. *Id.*

¶44 In *Alma S. v. Department of Child Safety*, 245 Ariz. 146, 150 ¶ 10 (2018), the Court held that most grounds for termination in § 8-533(B)— including the length of sentence ground at issue here—are "proxies for parental unfitness." Hence, each operates as essentially an irrebuttable presumption, such that proof of the statutory ground satisfies the government's burden to terminate the parent's fundamental right.

¶45 In *Santosky*, the Supreme Court observed that this first stage of termination proceedings "entails a judicial determination that the parents are unfit to raise their own children." 455 U.S. at 760. At that stage, "the State cannot presume that a child and his parents are adversaries." *Id.* Such factors as the intensity of the state's efforts to preserve the family, the perseverance of the family relationship, and the parent's rehabilitation efforts should be considered in this first stage of the proceedings, with its higher burden on the state to prove unfitness by clear

and convincing evidence. *Id.* at 769–70. Indeed, this Court recognized in *Jessie D.* that "requiring DCS to provide reunification services to an incarcerated parent . . . is a constitutional requirement under *Santosky*." 251 Ariz. at 582 ¶ 21; *accord Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 191 ¶ 28 (App. 1999).

**¶46** In *Jessie D.*, the Court stated that the length of sentence inquiry under § 8-533(B)(4) is "individualized and fact specific." 251 Ariz. at 579 ¶ 9. But as the Court applies it here, that individualized determination owes not to constitutional requirements, but to the statute's lack of clarity with respect to the undefined term, "normal home." *Supra* ¶ 26 (noting that the legislature could have, but did not, simply "provide[] as a ground for termination that the parent is imprisoned for a period of years").

**¶47** Per *Santosky*, all evidence pertaining to the parent's rights, including rehabilitation and efforts to preserve the family, should be considered in the first phase of the parental termination proceedings, where the state bears the greater burden of proof. In many cases, the parent will not contest termination, or the evidence of unfitness will be overwhelming. *See Santosky*, 455 U.S. at 762, 769–70. But in other cases, like this one, the issue will be greatly contested. I am satisfied that, after *Jessie D.* and this case, a careful, individualized determination will be made in the length of sentence context that takes into account the parent's fundamental rights.

**¶48** However, that confidence is undermined by the Court's assertion that "the parent's interest in maintaining a positive parent-child relationship and the parent's efforts and ability to do so" should be considered in the second stage of the termination proceeding, the child's best interests analysis. *Supra* ¶ 31. Similarly, the Court held in *Alma S.* that "courts should consider a parent's rehabilitation efforts as part of the best-interests analysis." 245 Ariz. at 151 ¶ 15. Those holdings are exactly what *Santosky* expressly rejected, given that in the best interests stage of proceedings the interests of the parent and child are presumed to diverge, the focus is therefore properly on the child's interests, and the inquiry is subject to the preponderance of evidence standard that *Santosky* repudiated in the context of determining the parent's rights. 455 U.S. at 758–70. The parent's interests should be considered in the unfitness stage, where "the child and his parents share a vital interest in preventing erroneous

termination of their natural relationship," *id.* at 760, a mutual interest that is especially manifest here.[4]

**¶49**　　　　This year marks *Santosky*'s fortieth anniversary.　Regretfully, that is the latest definitive word from the Supreme Court on the substantive and procedural due process principles that apply to "forced dissolution" of parental rights and "the irretrievable destruction" of family relationships. *Id.* at 753.　Notwithstanding the work that remains in bringing our jurisprudence, statutes, rules, and agency practices into harmony with the Fourteenth Amendment, I applaud my colleagues for a decision that recognizes the precious rights and interests at stake.

---

[4]　I have set forth my concerns in this regard in greater detail in *Alma S.*, 245 Ariz. at 152–56 ¶¶ 24–39 (Bolick, J., concurring in the result).